AO 91 (Rev. 11/11) Criminal Complaint                AUSA Scott R. Paccagnini (815) 987-4444

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION



UNITED STATES OF AMERICA

v.

NEIL SHARMA

CASE NUMBER:
**UNDER SEAL**

15 CR 5 0 0 0 5

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about February 27, 2015, at Rockford, in the Northern District of Illinois, Western Division, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 42, United States Code, Section 1320a-7b(b)(1)(A) | did knowingly and willfully solicit and receive, directly and indirectly, overtly and covertly, remuneration in the amount of $2,500 in cash, in return for defendant referring patients to Company B for which payment may be made in whole and in part under a federal health care program, namely Medicaid. |

This criminal complaint is based upon these facts:

__X__ Continued on the attached sheet.

WAYNE E. JACKOWSKI
Special Agent, Federal Bureau of Investigation (FBI)

Sworn to before me and signed in my presence.

Date: March 12, 2015

_____
Judge's signature

City and state: Rockford, Illinois

IAIN D. JOHNSTON, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS | ss

## AFFIDAVIT

I, WAYNE E. JACKOWSKI, being duly sworn, state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed for approximately nine years. I am currently assigned to the FBI's Chicago Field Office, Rockford Resident Agency, and my responsibilities include the investigation of white collar crimes and financial frauds

2. This affidavit is submitted in support of a criminal complaint alleging that on or about February 27, 2015, at Rockford, in the Northern District of Illinois defendant Neil Sharma did knowingly and willfully solicit and receive, directly and indirectly, overtly and covertly, remuneration in the amount of $2,500 in cash, in return for defendant referring patients to Company B for which payment may be made in whole and in part under a federal health care program, namely Medicaid, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A).

3. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging SHARMA with illegal remunerations, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

4. This affidavit is based on interviews of witnesses, the review of undercover audio and video recordings, my own observations and actions, information received from other law enforcement agents, my experience and training, and the experience of other agents.

5. This Affidavit describes portions of recorded and unrecorded conversations. To the extent that such communications are summarized, those summaries do not necessarily refer to all of the topics covered during the conversations. In addition, the summaries do not include every conversation made by every speaker on the topic being described. Portions of the conversations that are quoted are preliminary quotations from line sheets prepared by law enforcement agents that listened to the conversations and witnesses that participated in the conversations and may be modified upon further review. For some conversations, I have offered in brackets my understandings and interpretations of the conversation. My understandings and interpretations are based upon my experience and knowledge of the investigation to date, my interviews with witnesses, including interviews of a cooperating witness, who participated in the recorded meetings with defendant, the experience of other law enforcement agents with whom I have consulted, and my training and experience as a Special Agent.

### The Medicare Program

6. Based on my experience and training and discussions with other law enforcement agents, I know the following about Medicare program:

a. Medicare is a federally-funded national health care benefit program that provides free or below-cost health care benefits to certain eligible individuals, primarily individuals who are least 65 years of age or who have certain disabilities. Medicare is comprised of several different "parts," most notably: "Part A," which covers a portion of the costs of hospital inpatient stays and home health care; and "Part B," which covers a portion of certain outpatient physician visits and services.

b. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency of the Department of Health and Human Services. CMS in turn contracts with other organizations, usually health insurance carriers, to process Medicare claims and to perform certain administrative functions.

c. Enrolled providers of medical services to Medicare recipients are eligible for reimbursement for covered medical services. By becoming a participating provider in Medicare, enrolled providers agree to abide by the rules, regulations, policies, and procedures governing reimbursement, and to keep and allow access to records and information as required by Medicare.

### The Medicaid Program

7. Based on my experience and training and discussions with other law enforcement agents, I know the following about Medicaid program:

a. The Medicaid program is jointly funded by the federal government and the states. The federal government pays states for a specified

3

percentage of program expenditures, called the Federal Medical Assistance Percentage. In Illinois, the federal government pays 50 percent of the State of Illinois' program expenditures. The federal government makes quarterly grant awards to the State of Illinois to cover the Federal share of expenditures. In FY2012, the State of Illinois' total Medicaid spending was more than $13 billion.

    b. Under the Medicaid program, states can establish their own Medicaid provider payment rates within federal requirements. States generally pay for services through fee-for-service or managed care arrangements. Under managed care arrangements, states contract with organizations to deliver care through networks and pay providers and compensate these organizations with Medicaid program funds.

### The Medicare-Medicaid Plan

8. Based on my experience and training and discussions with other law enforcement agents, I know the following about Medicare-Medicaid program: The Medicare-Medicaid Plan is a joint effort between the Illinois Department of Healthcare and Family Services and CMS. The Plan provides benefits to enrollees of both programs.

### Company A

9. According to Company A's website, Company A is contracted with both Medicare and Illinois Medicaid to provide health care benefits to Medicare and Medicaid beneficiaries.

4

10. According to Company A's website, Company A is a managed care organization contracted with the State of Illinois to provide services under Illinois' Integrated Care Program. Company A gets paid Medicaid funds at an agreed rate based on the monthly number of Medicaid patients enrolled with Company A. Company A receives monthly Medicaid funds even for those patients that received no medical services during the month. Company A's contract with the State of Illinois requires Company A to have a Medical Director. According to the contract, the Medical Director must be an Illinois licensed Physician that is actively involved in all major clinical patient care programs as set out in the contract including review of medical care provided and medical professional aspects of provider contracts. The Medical Director is required to devote sufficient time to the contract to ensure that timely medical decisions are made, including afterhours consultation.

11. According to the Illinois Department of Financial and Professional Regulation, since March 2011, SHARMA has been a licensed Illinois physician. According to Company A's website, since September 2013, SHARMA has been Company A's Medical Director.

12. Company A's contract with the State of Illinois also requires Company A to provide Skilled Nursing Facility services ("SNFist"). A SNFist is defined in the contract as a physician or APN licensed under the Illinois Nurse Practice Act who is part of an organized system of care, meaning a coordinated group working together, whose entire professional focus is the general medical care of individuals residing in a Nursing Facility and whose activities include patient care oversight,

5

communication with families, significant others, primary care providers, and Nursing Facility administration. The contract between Company A and the State of Illinois requires Company A to provide SNFist service either through direct employment or a sub-contractual relationship.

### Company B

13. On February 13, 2015, after meeting with SHARMA on the same day [described below], Cooperating Witness ("CW") voluntarily contacted the Federal Bureau of Investigation. The CW described to agents the CW's relationship with SHARMA and what had occurred during the February 13, 2015 meeting. CW also provided me and other agents information about CW's companies, including Company B. According to CW and the Illinois Secretary of State's Office, Company B is owned by the CW[1] and is one of three companies contracted with Company A to provide SNFist services for Medicaid beneficiaries. Company B, and the other two SNFist providers, are provided a geographical area to cover by Company A.

14. All of the patients seen pursuant to the contract between Company A and Company B as part of its SNFist services are Medicare or Medicaid patients. Company A receives funds from Medicaid and Medicare for patients enrolled in their programs. Company A then pays Company B monthly based on the number of patients enrolled with Company A within Company B's assigned geographical

---

[1] CW has no criminal record and has not received any money from law enforcement agents. While talking with agents on February 13, 2015, CW agreed to audio and video record future meetings with SHARMA and audio record any telephone calls with SHARMA. CW has agreed to provide agents with electronic communications between SHARMA and CW. No promises have been made to CW regarding CW's cooperation.

region. Company B is paid regardless of whether anyone representing Company B treats a patient.

## Facts in Support of Probable Cause

### February 13, 2015 Meeting

15. On February 13, 2015, SHARMA and CW met in Darien, Illinois. During the meeting,[2] SHARMA told CW that he wanted to help CW's business. SHARMA offered to give CW an additional 500 SNFist patients immediately at an increased rate of $200 per patient. SHARMA also told CW he could ensure Company B's contract with Company A does not expire. In exchange, SHARMA said he wanted $20,000 immediately from CW and $20,000 per month after for an unidentified length of time. During this same meeting, SHARMA requested a response from CW by February 19, 2015. SHARMA also wanted a medical director contract with Company B backdated to February 1, 2015. Based on subsequent recorded conversation between SHARMA and CW, I believe SHARMA wanted to disguise any payments to him from CW as payments for his serving as a medical director for Company B.

### February 20, 2015 Meeting

16. On February 20, 2015, SHARMA and CW met in Darien, Illinois. During the meeting,[3] SHARMA said, "So what I would say is initially I was

---

[2] This meeting was not recorded as it occurred before CW went to the FBI.

[3] This meeting, and a subsequent face-to-face meeting on February 27, 2015, was audio and video recorded. All telephones calls after February 17, 2015, between SHARMA and CW were audio recorded. Unless otherwise indicated, the descriptions of these meetings below are based on law enforcements review of the recordings and interviews with CW.

7

thinking 20 [$20,000], maybe 16 [$16,000] is a little more safer." CW responded, "Probably safer." SHARMA said, "At least right now as we get more and more business we want to rethink about it because I want to make it proportioned to how the business is growing." SHARMA and CW also talked about how CW could pay SHARMA the money per month. Specifically, SHARMA asked, "Well you have four business lines right?"[4] CW responded, "I have, well right now, so I'll have four but [Company B] group will stay as is." SHARMA responded, "But four including [COMPANY B]?" CW replied, "Four including [Company B]." SHARMA then said, "Yeah so basically we have three already to work with [referring to CW's three other companies that SHARMA could be made medical director] . . . and if we do something like you're mentioning taking money out on a weekly basis . . . we can do half and half. Like if you do 10 [$10,000] . . . ." Later in the conversation, SHARMA said, "So I would say we do twenty-five hundred [$2,500] a week."

17. Later, CW asked, "And you're not going to come back at me later and say that I've changed my mind, I want it [the money to SHARMA] to come out of [Company B] too?" SHARMA responded, "No, no, no. I wouldn't." CW said, "It wouldn't make sense." SHARMA replied, "Yeah, I wouldn't want that to happen. Obviously as business grows we'll be able to rethink how about to compensate me."

18. Later during the meeting, SHARMA said, "[CW] I started you off with 900 members." CW responded, "And I greatly appreciated it." SHARMA continued, "And I wanted you to get it up and running . . . ." CW replied, "And I have it

---

[4] According to CW, CW has four businesses that perform medical services and Company B is the only one of CW's businesses contracted with Company A.

running." SHARMA then said, "(U/I) before you even start making a penny I'm going to reach in your pocket and take the money." CW replied, "Right." SHARMA continued, "So it is up to you right now." CW replied, "Yeah, I'm okay with sharing and doing this, whatever we're calling it, as long because you've given me the time . . . ."

19. SHARMA also talked about the additional patients CW would get in return. Specifically, SHARMA said, "So what I would say is we, I want to get this started, at least, clearly to be honest with you I wanted to get something today . . . ok, and um we can figure that out. But I want this to be really starting." SHARMA continued, "I can assure you 100% that even yesterday's call we spoke about nixing [one of the other two SNFist providers contracted with Company A] . . . and they have 450 members." CW asked, "You can determine who gets that territory?" SHARMA responded, "100%." CW asked, "And it wouldn't look funny?" Based on the context of the conversation, I believe CW is asking whether Company A would be suspicious that all the patients of the other SNFist provider would go to Company B. SHARMA replied, "Won't look funny at all. Um leave that up to me." Based on the context of this and other conversations, I believe SHARMA is offering the territory of another SNFist provider to CW's company in exchange for cash payments.

20. Later, SHARMA said, "So we're going to be starting that asap and I would say by 4/1 you'll be having another 450 members and in patients." CW

9

asked, "And their duals?"[5] SHARMA responded, "Um, I don't know if they're duals, what difference does it make when you're getting paid more." CW asked, "I get their territory [referring to the territory of the SNFist provider that SHARMA said is being nixed]?" SHARMA replied, "Yeah, yeah, yeah, exactly." Later, SHARMA said, "[CW] as of today I'm pushing the SNFist group moving forward. I'm developing new programs [discussed in the following paragraph] for discharge planning for follow-ups. I am expanding your territory."

21. In addition to the SNFist program, SHARMA also told CW about two other programs that SHARMA would give to CW. According to SHARMA, one program dealt with monitoring compliance of patients taking anti-depressant medications. As described by SHARMA, those working for CW would visit the patients and make sure the patient was in compliance with their anti-depressant medications. SHARMA also described a hospital re-admission program whereby those working for CW would visit recently discharged hospital patients to prevent patient hospital readmission. Both programs would be fee-for-service at a rate agreed upon by SHARMA and CW. Both programs would also involve only Medicaid and Medicare billed patients.

22. With regard to how often CW would provide SHARMA money for the increased business, SHARMA said, "I would say to that [CW] is once you start getting paid and there's a hold in one payment or something I would not be that concerned on your end because you will be getting paid." CW replied, "You know

---

[5] Duals are patients with both Medicaid and Medicare.

10

I'm conservative." SHARMA responded, "I understand that and then on my end is I wanted to make sure that that's going to be regular [referring to cash payments from CW]. I want to make sure because when one week goes into two ... and two goes into three ...."

23. While the plan was for CW to pay SHARMA on February 20, 2015, CW told SHARMA that CW did not have any money. As a result, SHARMA said CW had to pay by the evening of February 20, 2015. In response, CW asked, "If I don't do it tonight we're done." SHARMA responded, "uh-hum." CW asked, "What does that mean?" SHARMA said, "It means [CW] we have other options to use other providers you know." CW replied, "I know, I know, I know." SHARMA continued, "I'm putting you on first [U/I]."

**February 23, 2015 Telephone Call**

24. On February 23, 2015, CW called SHARMA. During the call, SHARMA said, "If you have anything further for what we spoke about then um my main thing and I know we worked that out, whatever ... Um what I wanted to work on is a timeline here because ... I mean I want to make this happen. I mean I want to strike when the iron's hot." CW replied, "No, absolutely. I ...." SHARMA said, "And every, this is all something that, you know, is an issue for us and ... you know, we, you come in and um and, and make necessary uh changes ... and, and really help us with our plan. I think that it'll be um a great situation to put you in that situation too." CW asked, "Yeah. Is it something that you want me to come and do a presentation on or is it something ...." SHARMA responded, "No, I

11

literally, literally what I want you to do is um, I mean, start figuring things out on your end [SHARMA wants CW to pay SHARMA the money]."

**February 27, 2015 Meeting**

25. On February 27, 2015, SHARMA and CW met in Rockford, Illinois. During the meeting, SHARMA and CW talked about the SNFist program as well as the anti-depressant medication program and the hospital readmission program. With regard to the anti-depressant medication program, SHARMA provided CW with a spreadsheet containing patient Medicaid numbers and other claims data for those patients Company A believes are not in compliance with their medications. SHARMA said, "He's [an individual working for Company A] the one that's developing the list and so what the plan is, is right now we have, because we're just rolling this out, all of the February members um we have, we have claims data where they identify (U/I) who has not received their meds." SHARMA continued later, "So, these are overdue ones." CW responded, "Right. Okay." SHARMA continued, "So overdue, those, you're going to have to catch up on all these, right?" CW answered, "That's fine." SHARMA said, "And then, and then, and, and as like tomorrow these are members that are going to be non-compliant." CW asked, "Do they [Company A] know I have this list or I'm acting like I don't?" SHARMA responded, "No, no, no, you don't have this list."[6]

---

[6] SHARMA did not give the list to CW but instead SHARMA showed the list to CW, for what I believe, as evidence that SHARMA was gathering the things he said he would do for CW once CW started paying SHARMA.

12

26. With regard to the hospital readmission program, CW asked, "And the Rockford program that's all [Company A] community members or is it just the ones who are hospitalized?" SHARMA responded, "Just the ones who are hospitalized?" CW asked, "So it's like fifteen, twenty people at any given time? SHARMA responded, "Like a day."

27. With regard to the SNFist program, SHARMA said, "You know . . . um and then time got away from me yesterday um but they're emails going around about sending out the term letter for [one of the other two SNFist providers contracted with Company A], which is a thirty-day term and so . . . ." CW asked, "How certain are you that that would happen?" SHARMA responded, "Well, the email's going out, terming [terminating] them." CW asked, "So that's going to happen?" SHARMA answered, "Yeah, yeah, yeah. We're terming them and we need people to replace them." CW asked, "And that people will be? SHARMA responded, "You. Of course." CW asked, "Guarantee it?" SHARMA responded, "100%, 100%. There's not a doubt in my mind that they're ever gonna go away from what I recommend." Later, when CW asked again how many more patients were being referred to her, SHARMA responded, "450 members getting there."

28. SHARMA and CW also talked about CW providing the kickbacks to SHARMA in cash. Specifically, CW said, "So um would you, would you prefer or if I could arrange and I found out a way that I can do everything in cash ... would that be your preference." CW continued, "Because I'm nervous about, I'm not nervous about the contract, I'm hesitant with the contract just because I feel it leaves a

paper trail. That's a lot of money." SHARMA asked, "How much, how much cash are you talking about?" CW responded, "Um at the beginning it would be sixteen [$16,000] because that's what I could get and like I figured out how I could possibly do twenty [$20,000] which is what we had talked about. Um but that way there's no I mean from a collaborating position that's not a big deal, but from a contract. You tell me what is your, do you feel any concern that if someone, cause I'm sure [Company A] would not be thrilled um you know if they found out that you're the medical director of all this [referring to CW's three other businesses] and you're making this extra money." SHARMA responded, "And we're getting extra business." CW replied, "I don't think that yea I mean it's wrong." CW asked, "What are you going to do, I mean how are you I mean it's not India you can't just keep cash in your backyard." SHARMA responded, "No and I know." CW continued, "But I want to make sure what's going to happen if your bank or someone comes in and your accountant goes what the hell is this." SHARMA responded, "No, no way. Everything is, I want to be moving a lot of my expenses into cash obviously. [U/I] so I'm going to have limited amount coming out of my bank account. [U/I] I'm going to be moving a lot to India."

29. Later SHARMA said, "No, no, no, no, there's no way that I'm going to keep that [referring to cash from CW] laying around or have a paper trail like [U/I] deposits." CW responded, "Yeah, that's what I wanted to know." SHARMA replied, "Not at all, not at all. I mean I'm not stupid." Later in the conversation, SHARMA said, "Yeah, there's no issues of this ever you know that I'm leaving a trail behind.

14

In fact, if you know, I know that it would be hard for them [referring to Company A] to ever find out that I was medical director." CW asked, "How would it be hard for them? How would it not, I mean to me that's, as we grow and especially the influx of business that's coming out of this arrangement it's going to allow me to certain things in my other programs and I would obviously be very conscientious of that." SHARMA responded, "I understand that but they [Company A] say [CW] we need your finances whatever." CW interjected, "Would they because in my contract I looked at it and it says they [Company A] can request it." SHARMA responded, "That's fine and if they do, they are going to look at [Company B]." Based on the context of the conversation and my interview with CW, I believe SHARMA is saying that Company A would request Company B's records but not the records of CW's other businesses and it is CW's other business that CW would use to pay SHARMA his kickback under the guise of his job as the medical director of the other businesses.

30. Prior to CW providing SHARMA with $2,500 in United States currency, CW asked SHARMA what is CW's guarantee that SHARMA is not setting up similar arrangement with other providers. In response, SHARMA said, "I'm not going to do anything, as long as this is working well our . . . ." CW asked, "What does that mean as long as this is working well?" SHARMA responded, "As long as it's working well that you are performing and I'm getting my money you're guaranteed that this is not going away." SHARMA continued, "Those are two things; it's not going to work if you perform bad quality, you know that." CW

15

responded, "Right, I'm not worried about that." SHARMA continued, "Ok and it's not going to work if you cannot financially sustain [continue paying SHARMA].

31. During this same meeting, CW provided SHARMA with an envelope containing $2,500 in United States currency. Upon placing the envelope on the table, CW said, "It's all 50's because they didn't have any 100's." SHARMA asked, "How much is it?" CW replied, "25 hundred." SHARMA responded, "Ok." CW said, "Because that is what you told me you wanted so I wasn't sure." SHARMA responded, "Well I thought we start at 10 [$10,000] went to 5 [$5,000], but now it's 2,500 [$2,500] a week."

32. Surveillance agents saw SHARMA leave the meeting with CW carrying the envelope containing $2,500. SHARMA entered his car with the envelope containing the $2,500 and left the area.

33. On Monday, March 9, 2015, CW started seeing patients referred to her by SHARMA that are part of Company A's anti-depressant medication compliance program. According to the CW, all of the patients are Medicaid and Medicare patients that are new patients for Company B.

16

## Conclusion

34. Based on the facts set forth above, there is probable cause that on or about February 27, 2015, at Rockford, in the Northern District of Illinois defendant Neil Sharma did knowingly and willfully solicit and receive, directly and indirectly, overtly and covertly, remuneration in the amount of $2,500 in cash, in return for defendant referring patients to Company B for which payment may be made in whole and in part under a federal health care program, namely Medicaid, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A).

FURTHER AFFIANT SAYETH NOT.

WAYNE E. JACKOWSKI
Special Agent, Federal Bureau of Investigation

SUBSCRIBED AND SWORN to before me on March 12, 2015.

IAIN D. JOHNSTON
United States Magistrate Judge